# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LEONARD EVANS,                                Civil Action No. 1:09-cv-819
     Petitioner,

                                     Dlott, J.

     vs.                                      Bowman, M.J.


WARDEN, LEBANON                               **REPORT AND**
CORRECTIONAL INSTITUTION,                     **RECOMMENDATION**
     Respondent.

       Petitioner, an inmate in state custody at the Lebanon Correctional Institution in Lebanon,

Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The case

is before the Court on the petition (Doc. 3); respondent's "Answer/Return Of Writ" with exhibits,

including the trial transcript (Docs. 8-9, 20);[1] petitioner's "traverse" in reply to the return of writ

(Doc. 12); and additional pleadings submitted by petitioner in support of the petition, which includes

a motion for an evidentiary hearing (Docs. 16-17).

## I. PROCEDURAL HISTORY

### State Trial Proceedings

       On October 13, 2005, the Hamilton County, Ohio, grand jury returned an indictment

charging petitioner with one count of murder in violation of Ohio Rev. Code § 2903.02(A), one

count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2), one count of carrying

concealed weapons in violation of Ohio Rev. Code § 2923.12(A), and one count of having weapons

while under disability in violation of Ohio Rev. Code § 2923.13(A)(3); a firearm specification was

attached to the murder and felonious assault charges.  (Doc. 8, Ex. 1).

---

[1]As initially filed, a state court entry attached as Exhibit 13 to the return of writ was incomplete because, apparently due to a clerical error, pages 2-3 of the four-page order were not docketed and filed in the Hamilton County Clerk of Court's online docketing system.  (*See* Doc. 9, Ex. 13).  In response to a request by clerical staff in the instant action, respondent corrected the error by filing on January 14, 2011 a complete copy of the four-page entry identified as Exhibit 13.  (Doc. 20).

The case proceeded to a trial before a jury, which acquitted petitioner of the felonious assault charge, but found him guilty on all other counts.  (*See* Doc. 8, Ex. 2).  On April 6, 2006, the trial court sentenced petitioner to an aggregate prison term of twenty-four and one-half years.[2]  (Doc. 8, Ex. 2).

### Direct Appeal Proceedings

With the assistance of new counsel, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District, raising the following assignments of error:

1. The trial court erred to the substantial prejudice of Defendant-Appellant when it entered a conviction based upon insufficient evidence.

2. The trial court erred to the substantial prejudice of Defendant-Appellant when it entered [a] conviction that was against the manifest weight of the evidence.

(Doc. 8, Exs. 4-5).

On December 26, 2007, the appellate court issued a Judgment Entry overruling petitioner's "manifest weight of evidence" claim and affirming the trial court's judgment.  (Doc. 9, Ex. 7).  In addressing petitioner's second assignment of error, the court also made the following factual findings, which are presumed correct under 28 U.S.C. § 2254(e)(1),[3] based on the evidence presented at petitioner's trial:

[Aubrey] McCreary was fatally shot shortly after midnight on October 6, 2005, in the

---

[2]Specifically, petitioner was sentenced to the following terms of imprisonment: fifteen (15) years to life for the murder offense, which was to be served consecutively and prior to a three (3) year prison term for the attached firearm specification; a consecutive eighteen-month prison term for carrying a concealed weapon; and a consecutive five-month prison term for having a weapon while under disability.  (Doc. 8, Ex. 2).

[3]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Because petitioner has neither cited nor presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, the state appellate court's factual findings are presumed to be correct.  *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir.), *cert. denied*, 543 U.S. 892 (2004).  It is noted, however, that the trial transcript reflects that the name of State witness Reginald Hill's cousin was "Ramondo," not "Ricardo" as stated in the factual findings quoted herein.

1700 block of Vine Street.  Cincinnati Police Officer Paul Renadette testified that he had found McCreary's body and blood on the sidewalk in front of 1711 and 1713 Vine Street.  McCreary was holding marijuana in one hand and money in the other.

The police found more of McCreary's blood and several spent bullet casings from the murder weapon in a breezeway that separated the buildings located at 1713 and 1715 Vine Street.

Cincinnati Police Officer Ryan Robertson, patrolling in the area undercover, heard the fatal shots fired.  Robertson then noticed Evans, who looked panicked, approaching a Dodge Polara on McMicken and Elder Avenues near the shooting. Robertson testified that he had overheard Evans tell the occupants of the Polara, Reginald Hill and his cousin Ricardo, that he needed to get out of the area.  The Hills did not allow Evans to enter the vehicle, and Evans began walking away.  Robertson then approached Evans and identified himself as a police officer.  Evans ran and Robertson gave chase.  During the approximately two-minute chase, Robertson observed Evans holding the waistband area of his pants and "clawing" at his clothing.  These acts led Robertson to believe, based upon previous handgun arrests that he had participated in, that Evans was attempting to retrieve a concealed firearm. Robertson lost sight of Evans for short periods of time during the chase, including when Evans passed a garbage can.  Eventually Evans fell, and Robertson held him at gunpoint while other officers arrested him.  Later, the police recovered the murder weapon inside the garbage can that Evans had passed during the chase.  Evans's hands contained gunshot residue, and his T-shirt contained blood stains that matched McCreary's blood.

Reginald Hill, the driver of the Polara, testified that Evans had indicated that he possessed a gun when he was attempting to enter the Polara.  Although Hill's trial testimony on the issue was equivocal, the veracity of this testimony was bolstered by Hill's unequivocal statement to police shortly after the shooting that Evans had verbally indicated that he had a gun and that he had touched his waistband as if he were going to show the gun to him and his cousin.  Hill's cousin did not respond to the state's subpoena to testify at trial.

Evans testified at trial that he had not shot McCreary.  Rather, he had interrupted two armed men wearing black hoodies as they were robbing McCreary inside the building at 1715 Vine Street.  Evans stated that after one of the robbers had pointed a gun at him, he turned and ran out of the building.  At the same time, he heard a gunshot and saw McCreary run.

Evans claimed that he had run a few blocks until he saw Reginald Hill and his cousin and asked them for a ride.  They turned him down, indicating that they did not want to draw the attention of undercover police officers who were in the area.  Evans noticed a white man in a vehicle staring at him.  He began running and eventually noticed that he was being chased.  He stated that he had stopped running when he saw uniformed officers and realized that the police were chasing him.  Evans claimed

that on the day of the shooting he had ignited fireworks and he had cleaned and test-fired a weapon.

(Doc. 9, Ex. 7, pp. 1-3).

Petitioner's appellate counsel filed a motion for reconsideration, arguing that the state appellate court was required to reconsider its decision because his assignment of error challenging the sufficiency of the evidence had not been addressed. (Doc. 9, Ex. 8). The Ohio Court of Appeals granted the motion for reconsideration and set aside the December 26, 2007 Judgment Entry. (Doc. 9, Ex. 12). On January 23, 2008, the court issued another Judgment Entry containing the same factual findings quoted above, *see supra* pp. 2-4, but overruling both assignments of error that had been raised by petitioner on direct appeal. (Docs. 9 & 20, Ex. 13).

Petitioner next filed a timely *pro se* notice of appeal from the December 26, 2007 direct appeal decision, as well as a memorandum in support of jurisdiction, with the Ohio Supreme Court. (Doc. 9, Exs. 14-15). He asserted as propositions of law the same two claims of error that had been raised on appeal to the Ohio Court of Appeals; he also alleged as an additional proposition of law that the Ohio Court of Appeals' failure to "pass upon all assignments of error properly raised and briefed on appeal" deprived him of "due process and equal protection of law." (Doc. 9, Ex. 15). On April 23, 2008, the Ohio Supreme Court denied petitioner leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question." (Doc. 8, Ex. 17).

### Application To Reopen Direct Appeal

On February 18, 2008, while his appeal from the December 26, 2007 direct appeal decision was pending before the Ohio Supreme Court, petitioner filed a *pro se* application under Ohio R. App. P. 26(B) with the Ohio Court of Appeals, First Appellate District, requesting that his appeal be reopened. Petitioner alleged in the application that his appellate counsel was ineffective for failing to raise the following claims as assignments of error:

4

     1.  The Prosecuting Attorney's Remarks During Opening Statement, And Further Closing Argument Constituted Prosecutorial Misconduct Which Deprived Appellant Of A Fair Trial In Violation Of The Fourteenth Amendment To The United States Constitution and Comparable Provisions Of The Ohio Constitution.

     2.  Appellant Was Denied The Effective Assistance Of Trial Counsel As Guaranteed By The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Object To Prosecutorial Misconduct.

(Doc. 8, Ex. 18).

     The Ohio Court of Appeals initially denied petitioner's reopening application on the ground that *res judicata* applied to bar review of petitioner's claims because petitioner "could have raised these challenges in his appeal to the Ohio Supreme Court."  (Doc. 8, Ex. 21).  However, on January 28, 2009, the Ohio Supreme Court reversed the Court of Appeals' decision on the authority of *State v. Davis,* 894 N.E.2d 1221 (Ohio 2008).  (*See* Doc. 8, Ex. 32).  In *Davis,* the state supreme court held that the *res judicata* doctrine may not be applied to preclude review of ineffective assistance of appellate counsel claims that are properly presented in a timely reopening application under Ohio R. App. P. 26(B) and not considered on the merits by the state supreme court on direct review.  In the instant case, because petitioner's ineffective assistance of appellate counsel claims were not presented to or considered by the Ohio Supreme Court on direct review, the Ohio Supreme Court remanded the reopening matter to the Ohio Court of Appeals "for further proceedings consistent with ... *Davis.*"  (Doc. 8, Ex. 32).

     On June 8, 2009, the Ohio Court of Appeals issued an Entry denying petitioner's reopening application after considering the matter in accordance with the Ohio Supreme Court's remand order.  (Doc. 8, Ex. 37).  The appellate court addressed the merits of petitioner's ineffective assistance of appellate counsel claims and concluded that petitioner had "failed to sustain his burden of demonstrating a genuine issue as to whether he has a colorable claim" under *Strickland v. Washington,* 466 U.S. 668 (1984).  (Doc. 8, Ex. 37).  The court reasoned:

Appellate counsel's performance in failing to assign [the prosecutorial misconduct and ineffective assistance of trial counsel claims] as error cannot be said to have been deficient. The alleged prosecutorial misconduct, and in turn, trial counsel's failure to object to it, would not have provided a basis for overturning Evans's convictions because, on the record as a whole, the assistant prosecuting attorney's comments cannot be said to have denied Evans a fair trial.

(Doc. 8, Ex. 37).

Thereafter, petitioner filed a timely *pro se* appeal to the Ohio Supreme Court. (*See* Doc. 8, Exs. 38-39). On August 26, 2009, the Ohio Supreme Court summarily dismissed the appeal "as not involving any substantial constitutional question." (Doc. 8, Ex. 41).

### Federal Habeas Corpus

Petitioner next filed the instant federal habeas corpus action in November 2009. (*See* Doc. 3). He alleges five grounds for relief:

**Ground One:** Insufficient Evidence.

**Supporting Facts**: There is little to show that Mr. Evans was carrying a concealed weapon, the police did not see one, and there is insufficient evidence for the murder of the victim. The evidence is clear that Mr. Evans did not murder the victim.

**Ground Two:** The conviction was against the manifest weight of the Evidence.

**Supporting Facts:** The accused presented a no less credible version of the facts. The accused encountered two people robbing someone in the hallway, seeing the weapons, he ran and they started shooting. The blood found on the shirt probably came from the accused touching a bloody surface and not from blood spraying on him.

**Ground Three:** Ineffective Assistance of Appellate Counsel.

**Supporting Facts:** Appellant's counsel failed to raise two (2) genuine issues infra and there is no reasonable justification for this failure.

**Ground Four:** Proscutorial Misconduct.

**Supporting Facts:** The prosecuting attorney made numerous improper and inflammatory remarks that deprived Mr. Evans of his constitutional right to a fair trial.

**Ground Five:** Appellant Was Denied The Effective Assistance Of Trial Counsel As Guaranteed By The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution When Trial Counsel Failed To Object To Prosecutorial Misconduct.

**Supporting Facts:** Appellant's counsel did not render effective assistance when he failed to object to the prosecuting attorney's improper assertions and evidence not presented.

(Doc. 3, pp. 6, 7, 9, 10, 12a).

In the return of writ filed in response to the petition, respondent concedes that the petition is not time-barred. (Doc. 8, p. 8). Respondent contends that the claim alleged in Ground One challenging the sufficiency of evidence lacks merit; Ground Two does not state a cognizable claim for federal habeas relief; Grounds Four and Five are barred from review because they were procedurally defaulted on direct appeal; and petitioner has not demonstrated, as alleged in Ground Three, that his appellate counsel was ineffective for procedurally defaulting the claims alleged in Grounds Four and Five. (Doc. 8, pp. 15-29). Petitioner has filed a "traverse" in reply to the return of writ and additional pleadings in support of the petition, which includes a motion for an evidentiary hearing. (Docs. 12, 16, 17).

## OPINION

### A. Petitioner's Motion For Evidentiary Hearing (Doc. 17) Should Be Denied

In a memorandum filed in support of the petition, petitioner has requested that an evidentiary hearing be held to develop the facts underlying his ineffective assistance of counsel claims alleged in Grounds Three and Five of the petition. (Doc. 17). However, all of petitioner's grounds for relief, including the ineffective assistance of counsel claims, are record-based and can be resolved on the basis of the record as developed in the state courts. Therefore, petitioner's motion for evidentiary hearing (Doc. 17) should be **DENIED**.

7

**B.  Petitioner Is Not Entitled To Relief Based On The Claims Alleged In Grounds One And Two Challenging The Sufficiency And Weight Of The Evidence**

In Ground One of the petition, petitioner contends that his convictions were obtained in violation of due process because the jury's guilty verdicts are not supported by sufficient evidence. (Doc. 3, p. 6).  In Ground Two, he alleges that the guilty verdicts are against the manifest weight of the evidence.  (Doc. 3, p. 7).  As respondent has conceded in the return of writ (Doc. 8, p. 10), the claims were "properly raised" by petitioner on appeal to both the Ohio Court of Appeals and Ohio Supreme Court and thus are not barred from review on procedural waiver grounds.  (*See* Doc. 8, Exs. 5, 15).

Nevertheless, Ground Two does not state a cognizable claim for federal habeas relief.  A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"); *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.), *cert. denied,* 540 U.S. 930 (2003).  The manifest-weight-of-the-evidence claim alleged in Ground Two raises an issue of state-law only.  *See Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982); *State v. Thompkins,* 678 N.E.2d 541, 546-48 (Ohio 1997).[4]  Therefore, only the sufficiency-of-evidence claim alleged in Ground One triggers a federal due process issue subject to review on the merits herein.

In this case, the Ohio Court of Appeals was the only state court to address the merits of the

_____

[4]It is noted that *Thompkins* was superseded on other grounds by state constitutional amendment allowing for state supreme court review of manifest-weight-of-the-evidence claims in death penalty cases.  *See State v. Smith,* 684 N.E.2d 668, 683-84 & n.4 (Ohio 1997), *cert. denied,* 523 U.S. 1125 (1998).

constitutional claim after granting petitioner's motion for reconsideration to specifically consider the sufficiency of evidence in conjunction with petitioner's separate claim challenging the weight of the evidence. The court rejected both claims of error, reasoning in relevant part as follows:

> The test for sufficiency of the evidence is whether any rational trier of fact, viewing the evidence in the light most favorable to the state, could have found the elements of the crime beyond a reasonable doubt. A weight-of-the-evidence claim requires an appellate court to sit as a "thirteenth juror." We must review the entire record, weigh the evidence, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.
>
> After reviewing the record, we are convinced that the state presented sufficient evidence to support Evans's convictions for murder with a three-year firearm specification, carrying a concealed weapon, and having a weapon under a disability. Further, we are not persuaded that the jury clearly lost its way and created a manifest miscarriage of justice when it found Evans guilty of the offenses. Evans's testimony was not supported by physical evidence. Additionally, Evans's trial testimony conflicted with taped statements that he had given to the police immediately after the shooting, as well as with the testimony of the state's witnesses. Finally, Evans's credibility was hampered by his prior felony convictions. The weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact.

(Docs. 9 & 20, Ex. 13, pp. 3-4) (footnotes to state statutory and case citations omitted).

In this federal habeas case, the applicable standard of review governing the adjudication of the constitutional claim addressed on the merits by the Ohio Court of Appeals is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

A legal principle is "clearly established" for purposes of habeas corpus review "only when

it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes,* 130 S.Ct. 1171, 1173 (2010).

"[A] federal habeas court reviewing the state-court judgment must apply the law that controlled 'at

the time his state-court conviction became final.'" *Miller v. Stovall,* 608 F.3d 913, 919 (6th Cir.

2010) (quoting *Williams v. Taylor,* 529 U.S. 362, 390 (2000)).

In addition, the "contrary to" and "unreasonable application" clauses set forth in 28 U.S.C.

§ 2254(d)(1) have independent meanings:

> A federal habeas court may issue the writ under the "contrary to" clause if the state
> court applies a rule different from the governing law set forth in [Supreme Court]
> cases, or if it decides a case differently than [the Supreme Court has] done on a set
> of materially indistinguishable facts...  The court may grant relief under the
> "unreasonable application" clause if the state court correctly identifies the governing
> legal principle from [the Supreme Court's] decisions but unreasonably applies it to
> the facts of a particular case....  The focus on the latter inquiry is on whether the state
> court's application of clearly established federal law is objectively unreasonable, and
> ... an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted).  Under § 2254(d)(1)'s "unreasonable

application" clause, the writ may issue only if the application is objectively unreasonable "in light

of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the

relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing

*Williams,* 529 U.S. at 412).

In the instant case, although the Ohio Court of Appeals cited only state cases, it correctly

identified and applied the clearly-established standard of review enunciated by the Supreme Court

in *Jackson v. Virginia,* 443 U.S. 307 (1979), in addressing petitioner's sufficiency-of-evidence

claim.  The Due Process Clause requires the State to prove beyond a reasonable doubt every fact

necessary to constitute the charged offense.  *In Re Winship,* 397 U.S. 358, 363-64 (1970).  As the

state appellate court recognized, when a petitioner raises a sufficiency-of-evidence claim in a

petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

The State is not required under the Due Process Clause to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the jury which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (*per curiam*), *cert. denied,* 490 U.S. 1049 (1989).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)), *cert. denied,* 130 S.Ct. 1134 (2010). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Id.* at 796-97 (and Sixth Circuit cases cited therein).

In the instant case, petitioner was convicted of murder with a firearm specification, carrying a concealed weapon, and having weapons while under disability. To establish the murder offense and attached fire specification, the State was required to prove beyond a reasonable doubt that petitioner purposely caused the death of another as set forth in Ohio Rev. Code § 2903.02(A), and

11

that he had "on or about his person, or under his control, a firearm while committing the offense of Murder and displayed the firearm, brandished the firearm, indicated that he possessed a firearm or used it to facilitate the offense." (*See* Doc. 8, Ex. 1). To establish that petitioner was guilty of carrying a concealed weapon under Ohio Rev. Code § 2923.12(A), the State was required to prove beyond a reasonable doubt that petitioner "knowingly carried or had, concealed on his person or concealed ready at hand[,] a handgun other than a dangerous ordnance." (*See* Doc. 8, Ex. 1). Finally, to establish petitioner's guilt for the weapons offense under Ohio Rev. Code § 2923.13, the State was required to prove beyond a reasonable doubt that petitioner "knowingly acquired or had or carried or used a firearm or dangerous ordnance, to wit: A HAN[D]GUN" while he was under a legal disability. (*See* Doc. 8, Ex. 1).

Petitioner does not dispute that he was under a legal disability stemming from various prior convictions when he was arrested soon after the shooting incident on October 6, 2005. He also does not dispute that the victim was murdered when he was shot five times during an interchange that occurred as the victim apparently attempted to purchase marijuana from persons in the area of 1713 and 1715 Vine Street. Moreover, petitioner has conceded that he was present at the scene of the shooting and fled after shots were fired.

Nevertheless, he claims that the evidence was insufficient to prove beyond a reasonable doubt (1) his identity as the shooter for the purpose of establishing his guilt on the murder charge and attached firearm specification; and (2) that he was carrying or possessed the murder weapon when fleeing the scene of the shooting for the purpose of establishing his guilt on the two weapons counts. (*See* Doc. 3, p. 6; Doc. 12, pp. 6-7). However, although no direct evidence was presented to establish those elements of the charged offenses, enough circumstantial evidence was introduced from which a reasonable inference could be drawn that petitioner was the person who murdered the

victim and carried the firearm used in the shooting, concealed in the waistband of his pants, when fleeing the scene.

Evidence was presented at trial connecting petitioner to the victim's murder to the extent that DNA obtained from a blood stain found on petitioner's T-shirt matched the victim's DNA profile. (Doc. 8, Trial Tr. 592-94, 682-86). Petitioner admitted he was present at the scene of the shooting, where his T-shirt ostensibly could have been stained by the victim's blood, but stated that he was unarmed and was not the person who shot and killed the victim. According to petitioner, the shooting began inside the building located at 1715 Vine Street as he was entering it to visit his "sister," who lived in one of the apartments, and saw the victim, who was standing in the middle of the hallway, being robbed by two "dudes" armed with guns standing to the right and left of the door. (Doc. 8, Trial Tr. 837-38).[5]

However, petitioner's version of events was undermined by evidence introduced at trial establishing that the shooting actually took place outside in the breezeway area between the two buildings located at 1713 and 1715 Vine Street. Cincinnati Police Officer Paul Renadette, who was one of the first officers to respond to the scene, testified that he secured the breezeway as a "crime scene" when he noticed blood running down the side of a pillar at the left corner of the breezeway at 1713 Vine Street, and upon entering the breezeway, observed "some blood" and 9mm shell casings scattered around. (Doc. 8, Trial Tr. 431, 435). Barbara Mirlenbrink, another police officer

---

[5]According to petitioner, the robber to the left of the door "pulled a gun on [him] while [he] was standing in the doorway," and that the robber to the right of the door had a gun "pointed at the victim." Petitioner stated that the robber on the right "probably shot first," and that at that point, the robber on the left turned his gaze away from petitioner. Petitioner heard a second shot fired, and after that, "[a]ll I know, I ran." (Doc. 8, Trial Tr. 838). Karjon Jones provided conflicting testimony to the extent petitioner stated that he entered the building because his "sister asked [him] to come up." (*See* Doc. 8, Trial Tr. 838). Jones, who was identified as petitioner's "sister," although not by "blood relationship," testified that she saw petitioner earlier in the evening, around 8:30 to 9:00 p.m., in front of her apartment building and that she said "goodnight" to him then. Jones testified further that she next went upstairs, put her children to bed, and went to bed herself after taking some medications; she did not wake up until she heard what sounded like an "explosion" outside. (Doc. 8, Trial Tr. 410-13).

who responded to the scene, corroborated Renadette's testimony to the extent that she testified that

she found one 9mm Winchester casing and four 9 mm Winchester Luger casings in the breezeway

during her investigation of the area.  (Doc. 8, Trial Tr. 572, 574-76, 587-88).  In contrast, after

obtaining entrance into the locked building located at 1715 Vine Street, police investigators searched

the hallway where the shooting witnessed by petitioner purportedly happened and found no evidence

of a shooting or any altercation there.  (Doc. 8, Trial Tr. 606-13).

      Other incriminating evidence was introduced at trial, which when viewed in the light most

favorable to the prosecution, supports the reasonable inference that petitioner was the shooter, who

was carrying the handgun used to kill the victim concealed in the waistband of his pants on fleeing

the scene.  Leslie Criswell, the victim's cousin, testified that he was parked across the street waiting

for the victim to return to their car when he heard two gunshots fired, followed by five or six more

shots.  (Doc. 8, Trial Tr. 444, 449-53).  He then saw a person, whom he believed was firing a gun

directly at him, heading north on Vine Street in the direction of Elder Avenue; although Criswell

was unable to identify the shooter from a photographic array, he told the police that the shooter was

"male black with dark skin, possibly shorts, a white T-shirt, around 23 or 24 years old."  (Doc. 8,

Trial Tr. 453, 455-56).

      Cincinnati Police Officer Ryan Robertson was patrolling the area in "plainclothes" with a

partner, traveling in an "undercover car" heading westbound on East McMicken near the intersection

of "East McMicken and East Elder," when they heard five or six gunshots coming from the 1700 area

of Vine Street, approximately a block and a half "southwest of us."  (Doc. 8, Trial Tr. 494–97).

Robertson testified that before they could even turn onto Vine to investigate, they "saw people

starting to flee the area;" they observed a male and a female "moving away from the area in a steady

14

fashion turning their heads," immediately followed by petitioner, who ran up to a Dodge Polara that was stopped on East Elder Avenue "getting ready to turn" onto East McMicken. (Doc. 8, Trial Tr. 497). Robertson noticed petitioner, who was wearing a white T-shirt and jeans, because he was "in a frantic state." (Doc. 8, Trial Tr. 498-99). Robertson further observed:

> He ran up to the passenger side of this vehicle and began to ask for a ride, except it was more, I need a ride; I need to get out of – out of here. It was very frantic, and that's what drew our attention.

(Doc. 8, Trial Tr. 498). At that point, the officers stopped their vehicle and made a u-turn in the middle of the street with "raised ... suspicions that [petitioner] may be tied into the shots we had just heard." (Doc. 8, Trial Tr. 498-99).

Reginald Hill, who was the driver of the Polara, corroborated Robertson's testimony that petitioner approached his car asking for "help," after Hill "immediately" stopped the car at the corner of Elder and McMicken Avenues upon hearing what he thought were gunshots. (Doc. 8, Trial Tr. 365-69). Evidence was introduced that petitioner tried to force his way into the car on the passenger side, but that Hill and his cousin, who was a passenger in the car, would not allow petitioner to enter the car when they discovered he had a gun. (See Doc. 8, Trial Tr. 372, 406, 528-29, 874-75).[6] Specifically, the following portion of Hill's statement to the police was read into evidence during Hill's re-direct examination:

> Q. So your cousin bumps him and asks him about a pistol. What exactly did he say?

---

[6]As the Ohio Court of Appeals found on direct appeal, Hill, who admitted that he did not want to testify at trial and had missed two prior court appearances, gave "equivocal" testimony at trial. (See Doc. 8, Trial Tr. 370-75 & Ex. 7, p. 2; see also Docs. 9 & 20, Ex. 13, p. 2). However, importantly, Hill did state that he believed that his cousin asked petitioner whether he had a gun, and that "it sounded like [petitioner] said yes" in response. (Doc. 8, Trial Tr. 373-74). Hill also conceded that his cousin prevented petitioner from entering the car "[t]o a certain point" because he was "kind of nervous about the situation, I guess." (Doc. 8, Tr. 372). Finally, Hill admitted that when petitioner said he had a gun, that is "basically" when he was refused entry into the car. (Doc. 8, Tr. 375-76).

A.  He said, do you have a gun on you?

Q.  What was the person's response?

A.  He backed up and he touched himself, his waistband.  He was like, yeah, yeah, I got a gun.

Q.  Okay.  Did you notice anything about the person at that point?

A.  I noticed where he was touching the gun at had like a little splotch of blood.... and I thought he was shot at that point, but I didn't really care because he said he had a gun and I was trying to get out of there.

Q.  So he says that he's got a gun, he admits to you he's got a gun on him and he touches his waistband; is that right?

A.  Yes, sir.

(Doc. 8, Trial Tr. 406-07).

When petitioner was refused entry into the Polara and began to walk off across McMicken Avenue, Robertson exited his vehicle, established eye-contact with petitioner, identified himself as a police officer and asked petitioner to stop so that he could talk to him.  (Doc. 8, Trial Tr. 500-01). Robertson said that is when petitioner began to run, fleeing "on foot eastbound on McMicken." (Doc. 8, Trial Tr. 502).  Robertson gave chase, pursuing petitioner alone on foot.  (Doc. 8, Trial Tr. 502).  Petitioner first ran into an alley, fell and "began to frantically pull at his waistband and his shirt."  (Doc. 8, Trial Tr. 503-04).  Petitioner's actions, which mimicked the movements of others with handguns whom Robertson had arrested in the past, led Robertson to believe that petitioner "had a gun in his waistband."  (Doc. 8, Trial Tr. 504).  Robertson stated that petitioner was "clawing at his clothing" and that it looked like  "he was attempting to pull the shirt up to retrieve the gun." (Doc. 8, Trial Tr. 505).  Robertson ordered petitioner  to "lay still, to roll over," but kept at a distance, "trying to give myself enough room to find adequate cover if, indeed, he had ... a

16

handgun." (Doc. 8, Trial Tr. 506).

Petitioner did not comply with Robertson's orders; instead, he got back up and ran north, where the alley ended at stairs leading up a hill to other streets. (Doc. 8, Trial Tr. 506). Petitioner started up the stairs, fell again "with motions to his waistband," and came out of his shoes before taking off again. (Doc. 8, Trial Tr. 506-07). Robertson continued to pursue petitioner, finding petitioner at one point hiding behind a number of "very large garbage bags stacked on top of each other." (Doc. 8, Trial Tr. 507-08). Again, Robertson spoke to petitioner, identifying himself as a police officer and commanding petitioner to stop, while "keeping in mind, at the same time, keeping a distance from him, putting out a broadcast." (Doc. 8, Trial Tr. 508). Again, petitioner did not comply with Robertson's orders, but instead, "got back up, came back out onto Clifton," and continued to run in a westbound direction. (Doc. 8, Trial Tr. 508). By that time, officers in uniform arrived to assist Robertson. Robertson testified that petitioner "fell again. But by that time uniform[ed] officers were out of the vehicle. And once he fell, I kept him at gunpoint, and the other officers were able to put him into custody." (Doc. 8, Trial Tr. 508).

Although no handgun was found on petitioner when he was finally apprehended, Robertson stated that during the foot chase, which lasted one to two minutes, he lost sight of petitioner at certain times, including when petitioner came out from behind the garbage bags and "cleared the building there." (Doc. 8, Trial Tr. 508-09). Robertson spoke to Reginald Hill, who confirmed Robertson's "original suspicion" that petitioner was armed with a handgun. (Doc. 8, Trial Tr. 510-11). Robertson said that after speaking with Hill, "[we] re-doubled our efforts in an attempt to find a weapon of some sort, a handgun," and "began to walk the route that we had run." (Doc. 8, Trial Tr. 511). Police presence was "heavy" in the area while the search was conducted, with the area

17

"taped off" and officers stationed to protect the scene. (Doc. 8, Trial Tr. 552, 556). Two to three hours later, Robertson discovered a handgun inside a garbage can located on Clifton Avenue, "just a little east" of where petitioner fell and was apprehended, in an area where Robertson had "briefly lost sight of [petitioner] on the foot pursuit." (Doc. 8, Trial Tr. 511, 514, 552, 559).

The police found a 9 mm Winchester cartridge in the handgun, and recovered a 9 mm Winchester Luger cartridge from the gun magazine. (Doc. 8, Trial Tr. 583-84). In addition, a 9 mm Winchester Luger was recovered from the chamber of the handgun, which meant that it was "[r]eady to fire." (Doc. 8, Trial Tr. 583). William Schrand, a firearms examiner at the Hamilton County Coroner's Crime Laboratory, testified that he test-fired the handgun and found it to be a "functional firearm." (Doc. 8, Trial Tr. 662-63). He also examined three 9mm bullets, which had been removed from the victim's body, and the five cartridge casings recovered from the scene of the shooting. He testified that it was his opinion to a "reasonable scientific certainty" that the five cartridge casings found at the crime scene were fired out of the handgun recovered from the garbage can by Robertson, and that the three bullets obtained from the victim's body were "consistent with the rifling class characteristics this gun can produce." (Doc. 8, Trial Tr. 653, 663-64).

Michael Trimpe of the Hamilton County Coroner's Crime Laboratory testified that gunshot residue testing of petitioner's hands, which was conducted soon after petitioner was taken into custody, revealed to a "reasonable scientific certainty" that petitioner had fired a gun, handled a gun after it was fired, or was within three feet of gun when it was fired. (Doc. 8, Trial Tr. 545-47, 631-32). Trimpe stated that the primary person expected to have the residue on him is the shooter. (Doc. 8, Trial Tr. 633). Moreover, although petitioner had told the officer who conducted the test that he had fired six fireworks earlier that day, Trimpe testified that fireworks residue is not comparable to

18

gunshot residue.  (Doc. 8, Trial Tr. 549, 635-36).

Finally, Cincinnati Police Officer Keith Witherell, who interviewed petitioner and taped a number of statements made by petitioner after his arrest, testified that petitioner admitted in one of his statements that he had fired the handgun found in the garbage can "earlier in the day" and provided an accurate description of the gun.  (Doc. 8, Trial Tr. 738-41, 782-83).  When Witherell asked petitioner whether the gun he had described was the "same handgun that was recovered by the police in a trash can near where you were captured," petitioner responded affirmatively.  (Doc. 8, Trial Tr. 783-84).

Viewing all of this evidence in the light most favorable to the prosecution, a rational juror could infer that petitioner had an operable firearm in his possession, which he used to purposely cause the death of the victim by shooting the victim multiple times in the breezeway on Vine Street; that when fleeing the scene of the shooting, petitioner carried the firearm as a concealed weapon in the waistband of his pants before discarding it in a garbage can near where he was finally apprehended by the police; and that petitioner was under a legal disability stemming from his prior convictions at that time.  (*See* Doc. 8, Trial Tr. 941-42).

Therefore, sufficient evidence was presented to establish petitioner's guilt beyond a reasonable doubt on the murder charge and attached firearm specification, as well as the two weapons counts.  In his "traverse" brief, petitioner argues that the State failed to establish that he had a "motive" to harm the victim; points to certain testimony, which he views as weaknesses in the State's case; and claims that his version of the events that transpired is true and demonstrates his innocence.  (*See* Doc. 12).  However, "motive" is not an element required to be proven before a person may be found guilty of murder under Ohio law.  Furthermore, the Ohio appellate court reasonably applied the *Jackson* standard when it concluded in rejecting petitioner's claims

challenging the weight and sufficiency of evidence that "the credibility of the witnesses were primarily for the trier of fact" to decide.  (Doc. 9, Ex. 13, p. 4).  As the Supreme Court held in *Jackson*, deference must be given to the trier of fact in resolving conflicts in testimony in favor of the prosecution and in weighing the evidence and drawing reasonable inferences from the evidence. *Jackson,* 443 U.S. at 318-19, 326.

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to relief based on the claims in Grounds One and Two of the petition challenging the sufficiency and weight of the evidence supporting his convictions for murder with firearm specification, carrying a concealed weapon, and having a weapon while under disability.  The claim alleged in Ground Two challenging the weight of the evidence is not subject to review in this federal habeas proceeding because it raises an issue of state-law only.  Moreover, the Ohio Court of Appeals' adjudication of the constitutional, sufficiency-of-evidence claim alleged in Ground One involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at trial.

### C.  The Prosecutorial Misconduct And Ineffective Assistance Of Trial Counsel Claims Alleged In Grounds Four And Five Are Procedurally Defaulted; Petitioner Has Not Demonstrated, As Alleged In Ground Three, That His Appellate Counsel Was Ineffective In Failing To Present Those Claims On Direct Appeal

In Ground Four of the petition, petitioner alleges that the prosecutor "made numerous improper and inflammatory remarks," which deprived him of a fair trial.  (Doc. 3, p. 10).  In Ground Five, he claims that his trial counsel's failure to object at trial to the prosecutor's misconduct constituted ineffective assistance.  (Doc. 3, p. 12a).  Finally, in Ground Three, petitioner contends that his appellate counsel was ineffective for not raising the prosecutorial misconduct and ineffective

assistance of trial counsel claims as assignments of error on direct appeal.  (Doc. 3, p. 9).[7]

As an initial matter, respondent contends that the claims alleged in Grounds Four and Five are procedurally defaulted because petitioner did not "fairly present[]" them as independent "standalone" claims to the state appellate courts for their consideration.   (Doc. 8, pp. 11-12). Respondent argues that, instead, the claims may be considered only to the extent they underlie petitioner's ineffective assistance of appellate counsel claim in Ground Three, which was "fairly presented" to and ultimately addressed on the merits by the Ohio Court of Appeals in denying petitioner's application under Ohio R. App. P. 26(B) for reopening of the direct appeal.  (Doc. 8, pp. 11-12).  Respondent's argument has merit.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).   A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,*

---

[7]In an additional pleading filed in November 2010 entitled "Notice Of Supplemental Authority," petitioner also claims that his appellate counsel was ineffective because he did not consult with petitioner or provide petitioner "with any real opportunity to participate or have input in his appeal."  (Doc. 16).  However, because petitioner did not assert these allegations in either his application for reopening of the direct appeal filed with the state courts or the instant federal habeas petition, the Court refuses to consider the additional claims at this late juncture.  *Cf. Murphy v. Ohio,* 551 F.3d 485, 502 (6th Cir.), *cert. denied,* 130 S.Ct. 397 (2009); *Tyler v. Mitchell,* 416 F.3d 500, 504 (6th Cir. 2005) (and cases cited therein) (holding that the district court did not err in declining to address a claim that was first presented in the petitioner's "traverse" brief), *cert. denied,* 547 U.S. 1074 (2006); *see also Burns v. Lafler,* 328 F.Supp.2d 711, 724 (E.D. Mich. 2004).

757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985). If the petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review. *See O'Sullivan,* 526 U.S. at 847-48; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If it is determined that the petitioner procedurally defaulted his claims in the state courts, federal habeas review is precluded unless the petitioner can demonstrate cause for the state procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *Harris,* 489 U.S. at 262; *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

Here, petitioner committed two procedural defaults. He failed to object to the prosecutor's alleged misconduct at trial, and he failed to raise claims on direct appeal challenging both the prosecutor's misconduct and trial counsel's failure to object to the misconduct. Petitioner did allege in his application for reopening of the appeal that his appellate counsel was ineffective for failing to raise the two claims as assignments of error on direct appeal. However, because petitioner never presented the prosecutorial misconduct and ineffective assistance of trial counsel claims to the Ohio appellate courts as independent assignments of error, but rather only as examples of appellate counsel's ineffectiveness, the claims are waived absent a showing of cause and prejudice or that a fundamental miscarriage of justice will occur if the claims are not addressed herein.

Petitioner has not demonstrated that failure to consider the claims alleged in Grounds Four and Five will result in a "fundamental miscarriage of justice," or in other words, that the alleged errors "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). However, petitioner has argued ineffective assistance of appellate counsel as "cause" for his procedural default on direct appeal.

Ineffective assistance of counsel may constitute cause for a procedural default. *See, e.g., Murray,* 477 U.S. at 488. In order to establish cause based on this argument, the ineffective assistance of counsel claim itself must not be procedurally-defaulted. *See Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.), *rev'd on other grounds,* 546 U.S. 74 (2005) (*per curiam*). Although petitioner defaulted the ineffective assistance of trial counsel claim alleged in Ground Five by failing to present it as an issue for consideration on direct appeal, he did fairly present the ineffective assistance of appellate counsel claim alleged in Ground Three to the state courts in his *pro se* application for reopening of the direct appeal, which was considered on the merits by the Ohio Court of Appeals. (*See* Doc. 8, Ex. 37).

To establish that his appellate attorney was ineffective, petitioner must demonstrate that (1) counsel made such serious errors he was not functioning as "counsel" guaranteed by the Sixth Amendment; and (2) the allegedly deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Under the first prong of the *Strickland* test, petitioner must show that appellate counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's

23

perspective at the time the conduct occurred. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.*

Appellate counsel is not constitutionally ineffective under this prong merely because he declines to raise a non-frivolous issue on appeal that was requested by the defendant. *See Jones v. Barnes,* 463 U.S. 745, 751 (1983) (holding that an "indigent defendant [does not have] a constitutional right to compel appointed counsel to press nonfrivolous points [on appeal] requested by the client"). As the Supreme Court stated in *Barnes,* 463 U.S. at 754:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy.... Nothing in the Constitution or our interpretation of that document requires such a standard.

"Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52); *see also Coleman v. Mitchell,* 268 F.3d 417, 430-31 (6th Cir. 2001), *cert. denied,* 535 U.S. 1031 (2002). It is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim on direct appeal; however, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins,* 528 U.S. 259, 288 (2000) (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)); *see also Wilson v. Hurley,* 108 Fed.Appx. 375, 379 (6th Cir. 2004), *cert. denied,* 543 U.S. 1160 (2005).

To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsel's errors, the result of the direct appeal proceeding would have been different. *See Strickland,* 466 U.S. at 694. Petitioner has met his

burden if he shows that the result of the appeal would "reasonably likely have been different absent the errors." *Id.* at 695.

The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *Id*. at 697.

In this case, the Ohio Court of Appeals concluded that petitioner had failed to demonstrate a genuine issue under the *Strickland* standard because the alleged prosecutorial misconduct underlying his claims of ineffective assistance by both his trial and appellate counsel did not deprive petitioner of a fair trial. (Doc. 8, Ex. 37). Upon review of the trial record, this Court agrees with the state appellate court's determination.

In both his reopening application and his "traverse" brief, petitioner has cited as the factual basis for his prosecutorial misconduct claim three comments that were made by the prosecutor either in opening statement or closing argument. (*See* Doc. 8, Ex. 18, p. 3; Doc. 12, p. 12). Specifically, petitioner challenges the following remarks made during the prosecutor's opening statement:

> The people that want to use drugs – in this case marijuana – have to get them from dealers. And frequently a user will go to a known drug area to get their drugs. And these areas are full of dealers, or people pretending to be drug dealers, in order to rip people off or steal their money.
>
> And what do these street people have, these dealers or rip-off artists have, to protect themselves or to use? They have guns. So when a buyer shows up on unfamiliar turf, they're at the mercy of the situation.
>
> And when you mix drugs and guns and money, that mixture is a formula for disaster. And that's the situation that [the victim] found himself in shortly after midnight, on October 6th of 2005, as he was senselessly gunned down by that man right there, Leonard Evans, in the breezeway of 1713 Vine Street.

(Doc. 8, Trial Tr. 303-04).

In addition, petitioner cites the following comments by the prosecutor during closing rebuttal

argument:

> What do we have to show that Leonard Evans is a victim?  All that we have is his
> own testimony....  And, first of all, the judge will tell you that you can use his prior
> record to test his credibility.  Do I believe Leonard Evans?  Well, what should I use?
>
> One of the things you use is his prior record.  Three prison numbers.  Breaking and
> entering, which is breaking in to steal on several occasions; possessing a stolen gun.
> These are things you look at.  Should I believe him or not?

(Doc. 8, Trial Tr. 1106).

Was it a planned robbery?  Probably, even though he's not charged with robbery.

(Doc. 8, Trial Tr. 1112).

Petitioner's allegations of prosecutorial misconduct concern ordinary trial error, which will

not amount to a constitutional violation unless the misconduct "so infected the trial with unfairness

as to render the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S.

637, 642-43 (1974); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) ("it 'is not enough

that the prosecutor's remarks were  undesirable or even universally condemned[;]'" rather, the

"relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally

unfair in violation of due process).  The alleged misconduct must be examined within the context

of the entire trial to determine whether it deprived the defendant of a fair trial. *United States v.

Young,* 470 U.S. 1, 11-12 (1985).

Factors to be considered in weighing whether a prosecutor's misconduct amounts to a due

process violation are: (1) the degree to which the misconduct has a tendency to mislead the jury and

to prejudice the accused, *see Darden,* 477 U.S. at 182, and *Young,* 470 U.S. at 12; (2) whether the

misconduct is isolated or extensive, *see Donnelly*, 416 U.S. at 646; (3) whether the misconduct is deliberate, *see id.* at 647; (4) whether the prosecutor manipulated or misstated the evidence, *see Darden,* 477 U.S. at 182, and *Berger v. United States,* 295 U.S. 78, 84-85 (1935); (5) the strength of the competent proof to establish the guilt of the accused, *see Darden,* 477 U.S. at 182; (6) whether the misconduct was objected to by defense counsel, *see id.* at 182-83 & n.14, and *Young,* 470 U.S. at 13; and (7) whether a curative instruction was given by the trial judge, *see Darden,* 477 U.S. at 182.[8]

As an initial matter, the Court finds that the prosecutor did not engage in any impropriety when he stated in closing argument that the jury could consider petitioner's prior criminal record for the limited purpose of assessing the credibility of his trial testimony.  In any event, as the Ohio Court of Appeals reasonably determined, none of the challenged comments rose to the level of a due process violation when viewed in the context of the entire record.

The first remarks made during the prosecutor's opening statement were arguably the most inflammatory to the extent that the prosecutor identified petitioner as the one who "senselessly gunned down" the victim in a "known drug area" where the mixture of "drugs and guns and money ... is a formula for disaster."  However, it is unlikely that the jury would have been misled by these passing, general remarks made at the beginning of trial before any evidence had been presented in the case.  Moreover, although defense counsel did not specifically object to the remarks when they were made, he countered them by arguing in opening statement as follows:

Everything that [the prosecutor] has told you is what he expects to prove.  It is not

_____

[8]*See also Gillard v. Mitchell,* 445 F.3d 883, 897 (6th Cir. 2006) (citing *Bowling v. Parker,* 344 F.3d 487, 512-13 (6th Cir. 2003), *cert. denied,* 543 U.S. 842 (2004)), *cert. denied,* 549 U.S. 1264 (2007); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.) (citing *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993), *cert. denied,* 510 U.S. 1201 (1994)), *cert. denied,* 522 U.S. 1001 (1997).

evidence and can't be considered as evidence. And you're going to find, probably, at the end, if you go back and view his opening statements, some of the stuff that he indicated to you, you're probably not going to hear any evidence supporting that. Some of it is speculation.

(Doc. 8, Trial Tr. 314-15).

The prosecutor's later references in rebuttal argument to petitioner's prior record for "breaking and entering" and "possessing a stolen gun" were neither inflammatory nor improper references to facts that had not been introduced into evidence at trial. Petitioner had earlier testified that he was convicted of breaking and entering and had other convictions for receiving stolen property, breaking and entering, and carrying a concealed weapon. (Doc. 8, Trial Tr. 941-42). The prosecutor properly limited the jury's consideration of petitioner's prior record for the purpose of assessing his credibility only. It is unlikely that the jurors were misled or inflamed by the remarks to improperly convict petitioner on the basis of passion or prejudice instead of the evidence.

Finally, in speculating that the shooting "probably" occurred during a "planned robbery," the prosecutor also pointed out that "[w]e don't know ... what happened," except that "there's some kind of drug deal that happens." (Doc. 8, Trial Tr. 1112). In addition, importantly, the remark was "invited" to the extent that defense counsel had argued in closing:

But has the state ever come forward with any sort of evidence as to what really happened in that breezeway? Was it a robbery? Was it a drug deal gone bad? Was it some kind of vendetta that somebody had against somebody else? Have you heard anything from the state telling you what really happened? I didn't hear it.

(Doc. 8, Trial Tr. 1074).

In assessing whether a prosecutor's misconduct amounts to reversible error in an "invited response" context, the court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Henry,* 545 F.3d 367, 381 (6th Cir. 2008) (quoting *Young,* 470 U.S. at 12). If found that the prosecutor's remarks were indeed

"'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."  *Id.* (quoting *Young,* 470 U.S. at 12-13).[9]

Here, the prosecutor did no more than respond substantially to defense counsel's closing argument in order to "right the scale."  In any event, when viewed in the context of the entire record, the Court is convinced that the jury was not misled or otherwise influenced by the prosecutor's "invited" speculatory comments about what may have happened to cause the shooting in the breezeway to convict petitioner on the basis of prejudice or anything other than the evidence that was presented at trial to establish petitioner's presence at the scene of the shooting and identity as the person who shot and killed the victim.

Accordingly, the Court concludes that because the underlying prosecutorial misconduct claim lacks merit, petitioner's appellate counsel was not ineffective in failing to raise the claim as an assignment of error on direct appeal, or any claim of error on trial counsel's part in failing to lodge a contemporaneous objection to the prosecutor's challenged remarks.  Petitioner, therefore, is not entitled to relief based on the ineffective assistance of appellate counsel claim alleged in Ground Three of the petition, or on the procedurally defaulted prosecutorial misconduct and ineffective assistance of trial counsel claims alleged in Grounds Four and Five of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's motion for an evidentiary hearing (Doc. 17) be **DENIED**.

---

[9]In *Henry,* the Sixth Circuit cited the following example of an "invited response" that did not amount to reversible error: "Although '[a] governmental attorney has a duty not to express a personal opinion or belief regarding the truth or falsity of any testimony or evidence,' the government may attempt to explain why, based on the facts, that witness's testimony is honest after the same has been attacked by the defense."  *Henry,* 545 F.3d at 379 (quoting *United States v. Hurst,* 951 F.2d 1490, 1502 (6th Cir. 1991) (in turn citing *Young,* 470 U.S. at 8), *cert. denied,* 504 U.S. 915 (1992)); *cf. Hinkle v. Randle,* 271 F.3d 239, 245-46 (6th Cir. 2001) (holding that "[w]hile the prosecutor's remarks [in rebuttal argument] had the effect of bolstering the reliability of DNA evidence in general, they came in response to the defense counsel's invitation to comment on the state of the accuracy and reliability of DNA evidence ").

2.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 3) be **DENIED** with prejudice.

3.  A certificate of appealability should not issue with respect to the claims alleged in Grounds Four and Five of the petition, which this Court has concluded were procedurally defaulted and thus barred from review on procedural grounds, because under the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling or whether petitioner has stated a viable constitutional claim in those grounds for relief.  A certificate of appealability also should not issue with respect to the non-defaulted claims alleged in Grounds One through Three of the petition in the absence of a substantial showing that petitioner has stated a "viable claim of the denial of a constitutional right" or that the issues presented are "adequate to deserve encouragement to proceed further."  *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

4.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).


s/Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

cbc

30

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LEONARD EVANS,                                    Civil Action No. 1:09-cv-819
      Petitioner,

                                        Dlott, J.

      vs                                          Bowman, M.J.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,
      Respondent.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).